| | | |
|---|---|---|
| WE CBD, LLC, and | ) | |
| WE C MANAGE, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| PLANET NINE PRIVATE AIR, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**THIS MATTER** is before the Court on Defendant's Motion for Summary Judgment. (Doc. No. 64).  This Motion has been fully briefed, (Docs. Nos. 65, 72, 73), and is now ripe for review.  For the reasons set forth below, the Court **GRANTS** Defendant's Motion.

## I.  BACKGROUND[1]

Plaintiffs We CBD, LLC ("**We CBD**") and We C Manage, LLC ("**WCM**," and collectively, "**Plaintiffs**") filed this action against Defendant Planet Nine Private Air, LLC, ("**Defendant**"),[2] asserting claims arising from the seizure and subsequent destruction of Plaintiffs' cargo—allegedly industrial hemp—by agents of the United States Customs and Border Protection (the "**CBP**"), while Defendant was transporting that cargo to Switzerland.  (Doc. No. 1, p. 1).

Plaintiffs are affiliated companies who work closely for the purpose of acquiring and distributing legal hemp.  (Doc. No. 1, p. 2).  Mr. Daniel Martin ("**Martin**") is the principal of both We CBD and WCM.  Defendant provides global charter aircraft.  (Doc. No. 22, p. 21).  Mr. Ed

---

[1] The background set forth herein is taken from a combination of the parties' briefing and attached exhibits.  The background is taken in the light most favorable to Plaintiff, the nonmoving party.

[2] Planet Nine is both the Defendant and the Third-Party Plaintiff in this matter.  (Doc. No. 20).

1

Clark ("**Clark**") is an independent charter broker employed by Jet Northwest, LLC ("**JNW**"). In October 2020, Clark contacted Defendant, informing Defendant that WCM was interested in chartering an aircraft for the transport of legal industrial hemp from Oregon to Switzerland. (Doc. No. 65-17, p. 7–8; Doc. No. 65-18, p. 18). Defendant requested confirmation that the cargo was industrial hemp and not illegal marijuana. (Doc. No. 65-18, p. 23; Doc. No. 65-19, p. 13; Doc. No. 65-17, p. 14; Doc. No. 72, p. 7). Plaintiffs, through Clark, then assured Defendant that their conduct was legal, the cargo was industrial hemp "with no THC," and all of the hemp had delta-9 THC levels below 0.3 percent. (Doc. No. 72, p. 7; Doc. No. 65-18, p. 23; Doc. No. 72-15; Doc. No. 65-4).

On November 1, 2020, Defendant sent Plaintiffs a binding "Quote for Aircraft Services," (the "**Quote**"), which Martin signed on November 4, 2020. (Doc. No. 65-5, p. 2; Doc. No. 65-18, p. 20). The Quote established the pricing, terms, and conditions of the parties' agreement that Defendant would transport Plaintiffs' cargo from Medford, Oregon, to Zurich, Switzerland, with a refueling stop in Charlotte, North Carolina. (Doc. No. 65-5, p. 1).

On November 2, Defendant's employee Justin Carwile, ("**Carwile**"), advised Clark that in advance of the trip, Defendant needed the proposed departure time, passenger details, catering requests, "[d]ocumentation showing approval to depart the United States with the cargo," and documentation from Swiss customs authorities ensuring the cargo would be permitted to enter Switzerland, among other things. (Doc. No. 65-8, p. 4). The next day, Carwile sent a follow up email regarding the requested information, which also stated: "is the client using a customs broker to file the appropriate exportation documents? It would be helpful for [Defendant] to have the brokers contact details." (Id. at 2). Later that day, Carwile sent Clark the contact information for a US customs broker, whom he "highly recommend[ed] reaching out to [] to ensure that the

products are exported properly from the US." (Id. at 1). Clark informed Defendant that Plaintiffs were using a customs broker in Zurich, (Doc. No. 65-9, p. 1), but he never relayed Defendant's recommendation that they also hire a customs broker in the U.S., (Doc. No. 65-17, p. 10). Instead, Martin told Lion Corners, the Swiss company that purchased the cargo at issue, he did not plan on using a customs broker for the shipment. (Doc. No. 65-12).[3]

On November 7, Defendant filed the general declaration with the CBP, including an outbound request for the chartered flight from Charlotte to Zurich to depart at 7:00 p.m. with four crew members and two passengers on board. (Doc. No. 72-11, p. 5). The general declaration, however, did not list any cargo as being transported. (Id.).

On November 8, Plaintiff loaded 3,328.05 pounds of alleged industrial hemp onto Defendant's aircraft via "58 military-style duffle bags and 35 black trash bags (a total of 93 bags)." (Doc. No. 72-11, p. 2; Doc. No. 72-20, p. 4). We CBD owned the cargo and was transporting it to the intended purchaser, Lion Corners, in Zurich. (Doc. No. 72-20, p. 4; see also Doc. No. 65-11). After departing from Oregon, the aircraft stopped in Charlotte, North Carolina, to refuel. (Doc. No. 65-14, p. 7–8). However, before it departed for Zurich, CBP officers conducted a border search of the aircraft and took a sample from Plaintiffs' cargo to perform a field test. (Id. at 8–9). The sample tested positive for THC. (Id. at 9; Doc. No. 65-15, p. 5). As a result, the CBP then detained Plaintiffs' cargo for further testing. (Doc. No. .72-11, p. 9). The cargo was removed from the aircraft and transported to a CBP vault, where it was stored pending the test results. (Id.). Nine samples from Plaintiffs' cargo were tested, and after eight of those samples tested over the

---

[3] On October 28, in messages to the purchaser, Martin messaged the purchaser: "We aren't going to use a broker- I have friends at the airlines who have pilot licensing for international travel. I will accompany the load personally." (Doc. No. 65-12). Then he wrote: "We hire two pilots for hourly wages, tip my boy well for putting it together for us- rent aircraft- buy fuel – BOOM." (Id.). Finally, Martin confirmed: "No customs," to which the purchaser replied, "Sounds like a plan." (Id.).

0.3% THC content line, the cargo was seized. (Id. at 10–11). On March 17, 2021, 2,779.83 pounds of Plaintiffs' cargo that tested above that limit was destroyed, (the "**First Batch**"), pursuant to summary forfeiture under 19 C.F.R. § 162.45a. (Id.; Doc. No. 65-15, p. 5). The remainder of the cargo, which tested below the limit, was left undisturbed pending the outcome of the civil forfeiture action, (the "**Second Batch**").

Two additional lawsuits arising from these facts predated the instant action. First, on March 19, 2021, We CBD sued the United States, asserting both tort and constitutional violations for the CBP's allegedly improper seizure and destruction of all of the cargo. We CBD, LLC v. U.S., No. 3:21-cv-00115-FDW-DCK, 2022 WL 989253 (W.D.N.C. Mar. 31, 2022). This Court dismissed all Plaintiffs' claims for lack of jurisdiction on March 31, 2022. Second, on June 7, 2021, the Government filed a civil forfeiture action for the remaining cargo—the Second Batch— that had not yet been destroyed. (Doc. No. 72-11); see U.S. v. Approximately 548.22 Pounds of Hemp Detained from We CBD, LLC on November 8, 2020, at Charlotte-Douglas International Airport, Civil Action No. 3:21-cv-267. However, following We CBD's Stipulation to Withdraw Verified Claim, (Doc. No. 72-23), this Court entered Judgment by Default in the Government's favor, (Doc. No. 72-22).

On July 19, 2021, Plaintiffs filed the Complaint in this action against Defendant alleging five claims for relief: (1) negligence; (2) gross negligence; (3) breach of fiduciary duty; (4) negligent misrepresentation; and (5) unfair and deceptive trade practices. (Doc. No. 1). Defendant then raises six Counterclaims against Plaintiffs: (A) breach of contract; (B) contractual indemnification; (C) fraud/fraudulent inducement; (D) fraudulent concealment; (E) negligent misrepresentation; and (F) "Declaratory Judgment: The Montreal Convention Governs Plaintiff's Claims." (Doc. No. 22). Additionally, on December 23, Defendant filed a Third-Party Complaint

4

against Clark and JNW, ("**Third-Party Defendants**"),[4] asserting six claims: (i) equitable indemnification; (ii) contribution, in the alternative; (iii) negligent misrepresentation; (iv) breach of contract; (v) promissory estoppel; and (vi) intended third-party beneficiary. (Doc. No. 20).

In response to Defendant's Counterclaims, Plaintiffs filed a Motion to Dismiss for Failure to State a Claim. (Doc. No. 28). Similarly, the Third-Party Defendants filed a Motion to Dismiss the Third-Party Complaint for Lack of Jurisdiction and a Motion to Quash. (Doc. No. 31). On June 28, 2022, this Court entered an Order denying the Third-Party Defendants' Motions, granting in part Plaintiffs' Motion to Dismiss "solely to the extent it seeks dismissal of [Defendant's] claim for declaratory judgment,"[5] and otherwise denying Plaintiff's Motion. (Doc. No. 44).

Defendant moved for summary judgment on all of Plaintiffs' claims on March 7, 2023. (Docs. Nos. 64, 65). The Third-Party Defendants filed their Notice of Joinder in Planet Nine Private Air, LLC's Motion for Summary Judgment on March 20. (Doc. No. 70). Plaintiffs filed their Response in Opposition to Defendant's Motion on April 4, (Doc. No. 72), and Defendant filed its Reply on April 11, (Doc. No. 73). Accordingly, Defendant's Motion is ripe for ruling. For the reasons set forth below, the Court **GRANTS** Defendant's Motion for Summary Judgment as to all Plaintiffs' claims.

## II.     STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

---

[4] The Third-Party Complaint also named Kelly McFall and K&R International Services, LLC, as third-party defendants. (Doc. No. 20). However, following Defendant's Notice of Voluntary Dismissal, both McFall and K&R were dismissed from this action without prejudice. (Doc. No. 39).

[5] In dismissing Defendant's declaratory judgment claim, this Court held: "the issue of whether the Montreal Convention applies to the parties' contract will be decided in the normal course of litigation. Because Planet Nine's contract claims already encompass the sole issue in its declaratory judgment claim . . . the Court declines to entertain the claim as requested." (Doc. No. 44, p. 8) (internal citations omitted).

5

56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted). Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert Cnty., Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson, 477 U.S. at 248. Also, the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. Id. If the evidence is merely colorable, or is

not significantly probative, summary judgment is appropriate. Id. at 249-50. In the end, the question posed by a summary judgment motion is whether the evidence as applied to the governing legal rules "is so one-sided that one party must prevail as a matter of law." Id. at 252.

### III. ANALYSIS

Defendant moves for summary judgment on all Plaintiffs' claims, arguing they are barred from recovery on five grounds: (1) the Montreal Convention; (2) public policy and the doctrine of collateral estoppel; (3) the economic loss doctrine; (4) the absence of both duty and causation; and (5) the lack of a principal-agent relationship between Defendant and Clark. For the reasons outlined below, the Court agrees that Plaintiffs' claims are preempted by the Montreal Convention, and as a result, Defendant's Motion is **GRANTED**.

### A. The Montreal Convention

The Convention for the Unification of Certain Rules for International Carriage by Air, also known as the Montreal Convention (or the "**Convention**"), was signed on May 28, 1999. S. Treaty Doc. No. 106-45, 1999 WL 33292734 (hereinafter "Montreal Convention"). The Convention is a "comprehensive international treaty of private international air law," Ehrlich v. Am. Airlines, Inc., 360 F.3d 366, 371 n.4 (2d Cir. 2004) (internal citations and quotations omitted), that recognizes "the importance of ensuring protection of the interests of consumers in international carriage by air and the need for equitable compensation based on the principle of restitution." Montreal Convention, pmbl. The Montreal Convention supersedes the Convention for the Unification of Certain Rules Relating to International Transportation by Air, commonly known as the Warsaw Convention. Montreal Convention, art. 55, ¶ 1. Nevertheless, "[p]ervasive authority . . . makes clear that it is appropriate to rely on cases interpreting Warsaw Convention provisions when the equivalent provisions in the Montreal Convention are substantially similar." Roberts v. Delta

Airlines, Inc., No. 1:19CV248, 2020 WL 4496544, at *5 (July 13, 2020) (citing Selke v. Germanwings GmbH, 261 F. Supp. 3d 666, 676 (E.D. Va. 2017) (collecting cases)).[6]

The "fundamental purpose" of the Montreal Convention is to "establish[] uniformity in the context of international carriage by air." Montreal Convention, Letter of Submittal, at *9. Accordingly, the Convention provides that in "the carriage of passengers, baggage and cargo, any action for damages, however founded, whether under this Convention or in contract or in tort or otherwise, can only be brought subject to the conditions and such limits and liability as are set out in this Convention." Montreal Convention, art. 29. In analyzing the Warsaw Convention's similar provision, the Supreme Court held that its "preemptive effect is clear: The treaty precludes [parties] from bringing actions under local law when they cannot establish air carrier liability under the treaty." El Al Isr. Airlines, Ltd. V. Tsui Yuan Tseng, 525 U.S. 155, 175 (1999).

Thus, "the Montreal Convention, like the Warsaw Convention before it, preempts 'all state law claims that fall within [its] scope.'" Badar v. Swissport USA, Inc., 53 F.4th 739, 744 (2d Cir. 2022) (quoting Shah v. Pan Am. World Servs., Inc., 148 F.3d 83, 97–98 (2d Cir. 1998) (cleaned up); Cohen, 13 F.4th at 245 (recognizing that when a plaintiff's "claims fall under the Montreal Convention, . . . any remedy must be had pursuant to that Convention.")). "Where an action for damages falls within one of the Montreal Convention's three damage provisions, 'the Convention

---

[6] The court in Selke cited Eli Lilly & Co. v. Air Exp. Intern. USA, Inc., 615 F.3d 1305, 1308 (11th Cir. 2010) (acknowledging that the Montreal Convention replaced the Warsaw Convention); In re Nigeria Charter Flights Contract Litig., 520 F. Supp. 2d 447, 453 (E.D.N.Y. 2007) ("Because the two conventions' preemptive language is substantially similar, they have 'substantially the same preemptive effect.'") (citing Paradis v. Ghana Airways, Ltd., 348 F. Supp. 2d 106, 111 (S.D.N.Y. 2004)). See also Butler v. Fed. Express Corp., No. 1:19-3447-JMC-SVH, 2020 WL 7647396, at *3 (D.S.C. Nov. 9, 2020) ("[C]ourts look to cases 'analyzing the Warsaw Convention to supplement the existing case law on the Montreal Convention.'") (citing Danner v. Int'l Freight Sys. Wash., No. RDB–09–3139, 2010 WL 3294678, at *3 (D. Md. Aug. 20, 2010) (hereinafter "Danner I")); Benjamin v. Am. Airlines, Inc., 32 F. Supp. 3d 1039, 1315 (S.D. Ga. 2014) (collecting cases) ("Although the Warsaw Convention no longer applies to claims arising after November 2003, the caselaw developed under it is regarded as applicable in the interpretation of the Montreal Convention's equivalent language.")); Badar v. Swissport USA, Inc., 53 F.4th 739, 744 (2d Cir. 2022).

provides the sole cause of action under which a claimant may seek redress for his injuries.'" Id. (quoting Seagate Logistics, Inc. v. Angel Kiss, Inc., 699 F. Supp. 2d 499, 505 (E.D.N.Y. 2010) (quoting Weiss v. El Al Isr. Airlines, Ltd., 433 F. Supp. 2d 361, 365 (S.D.N.Y. 2006)))[7]. Thus, to determine whether a claim falls within the Convention's scope and is therefore preempted, courts must "look to the Convention's liability provisions." Id. at 358 (citing Tseng, 525 U.S. at 171–72). These provisions alone determine whether a claim is preempted by the Montreal Convention: "As Tseng makes clear, the scope of the Convention is not dependent on the legal theory pled nor on the nature of the harm suffered," and preemption applies "even if the claim is not actionable under the treaty." Id. at 359, 361.[8] Applicable here is Article 18 of the Montreal Convention, which provides the conditions for a carrier's liability for the destruction, loss, or damage to cargo. Under this provision, a claim falls within the Convention's scope if "the event which caused the damage so sustained took place during the carriage by air." Id., art. 29, 18 ¶ 1.

In moving for summary judgment, Defendant argues Plaintiffs' claims are completely preempted by the Montreal Convention, and because Plaintiffs have not brought any of their claims pursuant to the Convention—and instead deny its applicability—the case must be dismissed in its entirety. Conversely, Plaintiffs allege the Montreal Convention is inapplicable to the facts in this case. Therefore, this Court must first consider the threshold issue of whether the requirement of "international carriage" is satisfied. If so, the Montreal Convention applies, and the Court must next determine whether Plaintiffs' claims fall within the Convention's substantive scope, as

---

[7] "The self-executing Montreal Convention creates a federal cause of action for claims within its scope . . . [that] is the *exclusive* means for pursuing such claims." Badar, 53 F.4th at 744 (emphasis in original) (cleaned up).

[8] This is so because "[u]niformity requires, . . . that passengers be denied access to the profusion of remedies that may exist under the laws of a particular country, so that they must bring their claims under the terms of the convention or not at all." King v. Am. Airlines, Inc., 284 F.3d 352, 357 (2d Cir. 2002) (explaining the Warsaw Convention establishes "a comprehensive liability system to serve as the exclusive mechanism for remedying injuries suffered in the course of the 'international transportation of persons, baggage, or goods performed by aircraft.").

determined by its liability provisions. Because this case involves cargo, this turns on whether the event that caused the destruction of Plaintiffs' cargo took place during carriage by air. If it did, the Montreal Convention preempts Plaintiffs' state law claims, and "any action, however founded," is subject to the Convention's conditions and limitations on liability.

       1.    <u>International Carriage</u>

Addressing the threshold issue, Article 1 establishes the "Convention applies to all international carriage of persons, baggage or cargo performed by aircraft for reward." Montreal Convention, art. 1, ¶ 1. "International carriage" is defined as "any carriage in which, according to the agreement between the parties, the place of departure and the place of destination, whether or not there be a break in the carriage . . . , are situated . . . within the territories of two States Parties . . . ." Montreal Convention, art. 1, ¶ 2.

Here, the relevant facts demonstrating "international carriage" are not in dispute. The United States and Switzerland are both Parties to the Convention,[9] and the Quote lists the departure and destination cities as Medford, Oregon, and Zurich, Switzerland. (Doc. No. 65-5, p. 1). That the aircraft stopped to refuel in North Carolina does not alter this conclusion, because "'international carriage' includes all segments of an international journey contained in the agreement or contract between the parties." <u>Danner I</u>, 2010 WL 3294678, at *3 (<u>quoting</u> Montreal Convention, art. 1 ¶ 2).

Therefore, Plaintiffs' claims arise out of the international carriage of Plaintiffs' cargo by aircraft, and as such, the Montreal Convention applies. Thus, this Court must next determine

---

[9] Int'l Civ. Aviation Org., Convention for the Unification of Certain Rules for International Carriage by Air, Done at Montreal on 28 May 1999, p. 1, 3 (1999), https://www.icao.int/secretariat/legal/List%20of%20 Parties/Mtl99_EN.pdf.

whether Plaintiffs' claims fall within the Convention's substantive scope as established by the Convention's liability provision concerning the destruction of cargo.

       2.    <u>Carrier Liability for the Destruction of Cargo</u>

Article 18 provides carriers will be "liable for damage sustained in the event of the destruction or loss of, or damage to, cargo upon condition only that the event which caused the damage so sustained took place during carriage by air." Montreal Convention, art. 18 ¶ 1.

Here, the parties disagree as to what caused the destruction of Plaintiffs' cargo, and whether that event took place during carriage by air. Defendant argues the illegal nature of Plaintiffs' cargo caused the CBP to seize and ultimately destroy it, and that this seizure took place during carriage by air because it constitutes an act of public authority that occurred during the course of an international transportation itinerary. Conversely, Plaintiffs contend the cargo was legal, and instead, the event that caused the destruction of their cargo was Defendant's failure to file correct customs paperwork. (Doc. No. 72, p. 5) (The "CBP destroyed *it all*, not because any was marijuana, but because Planet Nine had failed to submit CBP paperwork."). Further, Plaintiffs allege the damage did not occur during carriage by air because the cargo was not in Defendant's charge; it was being transported outside of the airport by land under the CBP's custody and control. Accordingly, to determine whether Plaintiffs' claims fall within the substantive scope of the Montreal Convention, this Court must decide first what caused the destruction of Plaintiffs' cargo, and then whether that event took place during carriage by air.

       a.    *The Event that Caused the Destruction of Plaintiffs' Cargo*

An "event" in in the context of Article 18 "refers to the cause of injury rather than the injury itself." <u>Sakaria v. Trans World Airlines</u>, 8 F.3d 164, 170 (4th Cir. 1993) (establishing "the essential elements" for personal injury or death claims under the Warsaw Convention) (<u>citing Air</u>

France v. Saks, 470 U.S. 392, 405 (1984)).[10]  "In essence, if the event that caused the damage [to the cargo] took place during the 'carriage by air,' as defined in the Montreal Convention, the carrier is strictly liable for damage sustained, subject to [the] enumerated affirmative defenses."  Danner v. Int'l Freight Sys. Wash., LLC, No. ELH–09–3191, 2013 WL 78101, at *13 (D. Md. Jan. 4, 2013) (citing Bassam v. Am. Airlines, 287 F. App'x 309, 312–13 (5th Cir. 2008)) (hereinafter "Danner II"); Knowlton v. Am. Airlines, Inc., No. RDB–06–854, 2007 WL 273794, at *2 (D. Md. Jan. 31, 2007)).[11]

The parties disagree as to what "event" caused the destruction of Plaintiffs' cargo. Defendants argue the CBP destroyed Plaintiffs' cargo because of its illegal nature, and not as a result of Defendant's actions.  Plaintiffs assert that the cargo was legal, and that "Planet Nine's negligence was . . . the cause of the seizure and destruction, the government was simply the means."  (Doc. No. 72, p. 12).  However, even viewing the evidence in the light most favorable to them, Plaintiffs have failed to show there is a genuine dispute as to any material fact regarding the reason the cargo was seized and eventually destroyed.  Instead, the evidence on the record demonstrates the cargo was seized and subsequently destroyed because it contained illegal marijuana instead of legal, industrial hemp.

---

[10] Considering the Warsaw Convention's provision for passenger injuries, the Supreme Court determined "the text of Article 17 refers to an accident which caused the passenger's injury, and not to an accident which is the passenger's injury."  Saks, 470 U.S. at 398 (emphasis in original).  The Court thus held "that liability under Article 17 of the Warsaw Convention arises only if a passenger's injury is caused by an unexpected or unusual event or happening that is external to the passenger," but "when the injury indisputably results from the passenger's own internal reaction to the usual, normal, and expected operation of the aircraft, it has not been caused by an accident, and Article 17 . . . cannot apply."  Id. at 406.

[11] See also Best Value Kosher Foods, Inc. v. Am. Airlines, Inc., 220 F. Supp. 3d 296, 301 (E.D.N.Y. 2016) (citing Weiss, 220 F. Supp. 2d at 365).  Article 18 does not limit a carrier's liability "to the period during which the carrier is in possession of the cargo at an airport or on board an aircraft . . . .  Article 18 is intended to cover damage to cargo whenever and wherever the cargo is in the possession, custody, or charge of the carrier."  Best Value, 220 F. Supp. 3d at 301 (quoting AIG Prop. & Caus., Co. v. Fed. Express Corp., 2016 WL 305053, at *6 (S.D.N.Y. Jan. 25, 2016)) (emphasis added).

It is undisputed that the CBP, and not Defendant, destroyed Plaintiffs' cargo. It is also undisputed that the Second Batch tested as legal hemp rather than marijuana, and that the CBP destroyed it following We CBD's Stipulation to Withdraw its Verified Claim in the forfeiture action. (Doc. No. 65-14, p. 11; Doc. No. 72-23; Doc. No. 72, p. 6–8). However, Plaintiffs argue the First Batch was also legal, and Defendant "has no evidence that any of the hemp was illegal." (Doc. No. 72, p. 7). These arguments are without merit for two reasons.

First, it is Plaintiffs—and not Defendant—who have failed to provide sufficient evidence of the condition and contents of the cargo at the time of its delivery to Defendant and subsequent seizure by the CBP. See Best Value, 220 F. Supp. 3d at 301–02 ("Without adequate evidence of the condition of the [cargo] when [the defendant-carrier] received it in Paris, [the plaintiff] cannot prove that the shipment was damaged during 'carriage by air,' a prerequisite to holding a carrier liable.") (citing UPS Supply Chain Sols., Inc. v. Am. Airlines, Inc., 646 F. Supp. 2d 1011, 1012 (N.D. Ill. 2009) (holding that "a prima facie case of liability is established upon the showing that the *goods were delivered to the carrier in good condition*, were delivered to the consignee at destination in damaged condition, and resulted in a specific amount of damage.") (emphasis added) (internal quotation marks omitted)).

Instead, Plaintiffs simply conclude "[n]one of the hemp was marijuana," allege without legal support that the "government used the wrong test for the First Batch," and cite outdated analyses for the cargo that were completed on a range of dates. The Certificates of Analysis, which Plaintiffs reference in support of their argument that cargo was legal, show the producing farms tested their products on: August 19, 2020; August 28, 2020; September 4, 2020; and September 17, 2020. (Doc. No. 72-14). However, the cargo at issue was loaded onto Defendant's aircraft and subsequently seized on November 8, 2020, months after these tests were performed. (Doc.

No. 72, p. 1). Even taking Plaintiffs' assertion as true that the hemp tested on these dates had delta-9 THC levels below 0.3 percent, Plaintiffs have failed to produce any evidence demonstrating the hemp tested in August and September was the same as the hemp seized in November. To the contrary, Martin's own testimony demonstrates at least 500 pounds of the seized cargo came from Seattle following a prior failed attempt to export merchandise to Switzerland in October 2020, and the cargo on the November 8 flight ultimately came from three different sources—Zoe Therapeutics, Hemp Worldwide, and the freight company in Seattle. (Doc. No. 65-18, p. 19, 27). Conversely, the CBP's test results—which establish a clear chain of custody between the November 8 seizure and the subsequent testing—establish that eight of nine samples tested well above the legal THC limit. (Doc. No. 72-12).[12]

Thus, on one side is Martin's acknowledgement that the seized cargo came from multiple "batches" and locations, and the lack of any evidence showing the seized cargo was the same as that examined in the Certificates of Analysis. On the other are tests identifying specific samples taken directly from the seized cargo with THC levels above the legal limit. Plaintiffs have failed to provide any evidence refuting the CBP's determination that the cargo was illegal marijuana, or instead demonstrating the cargo was legal, aside from Plaintiffs' unsupported, self-serving conclusory allegations that are insufficient to give ruse to a genuine issue of material fact. Celotex, 477 U.S. at 322 n.3; see also Best Value, 220 F. Supp. 3d at 301–02.[13]

---

[12] The nine samples contained 0.43%, less than 0.3%, 0.61%, 0.39%, 0.69%, 0.50%, 0.36%, 0.40%, and 0.43% total tetrahydrocannabinols (THC) content. (Doc. No. 72-12).

[13] The CBP's test results constitute the only evidence demonstrating the cargo's condition at the time the CBP seized it. To challenge the CBP's test results, Plaintiffs assert that the CBP used the wrong test to determine that the First Batch was illegal because the CBP used the "total THC test" rather than the "delta-9 test." (Doc. No. 72, p. 6). However, Plaintiffs fail to provide any legal support for this conclusion. Accordingly, the Court declines to address this argument.

Second, Plaintiffs have similarly failed to demonstrate the destruction of the cargo had anything to do with Defendant's incorrect general declaration. The Court addresses the obligations under the Montreal Convention and the United States regulatory scheme below. However, even assuming Plaintiffs are correct that the cargo was initially flagged and detained because the general declaration failed to indicate any cargo onboard the aircraft, it does not follow that the cargo was destroyed for the same reason. Defendant was cited and fined for its violation, (Doc. No. 72-8), but neither of the Notices of Penalty mention the subsequent seizure, forfeiture, and destruction of the cargo here. (Doc. No. 72-8; Doc. No. 65-16). In fact, Plaintiffs have failed to cite any evidence indicating—or even allowing for the inference—that the cargo was destroyed because of Defendant's mistake. To the contrary, Defendant has provided ample evidence, including the CBP's test results, showing the cargo was destroyed because the tests determined the cargo was illegal marijuana rather than legal hemp. (Doc. No. 65-14, p. 20–24).[14]

---

[14] The Court further notes that Plaintiffs' characterization of the Government's position on the legality of the cargo seriously misstates the Government's prior representations on the subject. Plaintiffs assert the "CBP destroyed *it all*, not because any [of the cargo] was marijuana, but because Planet Nine had failed to submit CBP paperwork." (Doc. No. 72, p. 5). In support of this statement, Plaintiffs cite communications between Seth Johnson, Assistant United States Attorney, and Plaintiffs' counsel William Terpening, related to We CBD's lawsuit against the United States, wherein Johnson wrote: "Putting aside any hemp versus marijuana dispute the parties may have, simpler forfeiture grounds exist under 19 U.S.C. § 1595a(d). . . ." (Doc. No. 7-10, p. 2). However, this statement cannot be interpreted as the Government conceding that the hemp was legal, nor does it demonstrate that the cargo was seized because of paperwork issues. Instead, this statement merely points out that other grounds existed for the initial detention of the aircraft. Further refuting Plaintiffs' apparent interpretation of the Government's position is Johnson's statement, made in the paragraph immediately preceding the paragraph Plaintiffs cite, stating: "As a threshold matter, I would note that this section of my letter is merely intended to be informational based on what I have seen to date—an admittedly very short time in the case—and, *unlike the confirmations given above, is not a definitive position of the Government's.*" (Id.) (emphasis added). Conversely, the section before this disclaimer provides:

> I have confirmed with CBP that on March 17, 2021 . . . CBP destroyed the roughly 2,779.83 pounds of the seized property that tested positive for marijuana (a Schedule I controlled substance) pursuant to its authority under, *inter alia*, 19 C.F.R. § 162.45a (providing for the summary forfeiture of Schedules I and II controlled substances for which the "notice procedures set forth in § 162.45 are inapplicable"). Samples were tested at CBP's San Francisco laboratory, and I have attached the test results,[] which indicate THC levels for these samples ranging from 0.36% to 0.69%, with the majority being 0.40% or higher.

(Id. at 1). Thus, Johnson's statements actually refute Plaintiffs' assertion by demonstrating neither that the Government determined the cargo was legal, nor that the Government destroyed the cargo because of the

15

Therefore, the Court finds that the "event" that caused the cargo's destruction was the CBP's determination—following the cargo's seizure and testing—that the cargo was illegal marijuana rather than legal industrial hemp, and not a result of Defendant's actions.[15]  Accordingly, the Court now addresses whether the destruction of Plaintiffs' cargo was during carriage by air.

### b. Carriage by Air

"Carriage by air" is "the period during which the cargo is in the charge of the carrier."  Id., art. 18 ¶ 3.  Although the "period of carriage by air does not extend to any carriage by land, by sea or by inland waterway performed outside an airport," id., art. 18 ¶ 4, "[s]o long as the goods remain in the air carrier's actual or constructive possession pursuant to the terms of the carriage contract, the period of 'transportation by air' does not end."  Danner I, 2010 WL 3294678, at *4.  However, if carriage by land "takes place in the performance of a contract for carriage by air, for the purpose of loading, delivery, or transhipment, any damage is presumed, subject to proof to the contrary, to have been the result of an event which took place during the carriage by air."  Id., art. 18 ¶ 4.

As stated above, where the event that caused the damage occurred during the carriage of the cargo by air, carriers are strictly liable for the damage, subject to the Convention's affirmative defenses and limits on recovery.  Danner II, 2013 WL 78101, at *13.  To that end, the Convention establishes that a "carrier is not liable if and to the extent it proves that the destruction, or loss of, or damage to, the cargo resulted from . . . an act of public authority carried out in the connection with the entry, exit, or transit of the cargo."  Montreal Convention, art. 18 ¶ 2.

---

incorrect general declaration.  Instead, these statements emphasize that the cargo was destroyed because the CBP determined it was illegal marijuana.

[15] Further, in communications with the CBP specialist handling the cargo at issue, Frank Robison—the attorney representing Plaintiff WCM "with respect to a recent detention of merchandise that has now apparently been seized," (Doc. No. 72-19, p. 23; Doc. No. 65-18, p. 45)— acknowledged that "the legal status of the hemp is now apparently in question," and that the "decision to seize the merchandise was presumptively made according to 'test results.' Otherwise, the detained merchandise should not have been seized."  (Doc. No. 72-19, p. 18, 15).

The undisputed evidence demonstrates both that the Montreal Convention's definition of "carriage by air" is satisfied, and that the destruction of Plaintiffs' cargo resulted from an act of a public authority—the CBP—related to its exportation. First, relevant for the definition of "carriage by air," Plaintiffs' cargo was seized at the Charlotte-Douglas International Airport during a refueling stop. (Doc. No. 1, p .3). This was the first leg of an international charter—the cargo was originally loaded onto Defendant's aircraft in Oregon, and it was to be unloaded at its ultimate destination in Switzerland. (Doc. No. 65-5, p. 1). Plaintiffs concede that the cargo was in the charge of the carrier—Defendant—when the CBP seized the cargo, and that the CPB—not Defendant—subsequently destroyed the cargo. (Doc. No. 72, p. 11). Thus, the facts satisfy the Montreal Convention's definition of "carriage by air."

Second, the "public authority" exemption is clearly satisfied. The CBP is undoubtedly a public authority. Best Value, 220 F. Supp. 3d at 302 (citing 21 U.S.C. § 381; 19 C.F.R. § 12.1). In fact, the Montreal Convention expressly acknowledges as much: in outlining the consignor's documentation responsibilities, the Convention states "the consignor must furnish such information and such documents as are necessary to meet the formalities of *customs, police and any other public authorities*." Montreal Convention, art. 16 ¶ 1 (emphasis added). Further, this exception necessarily includes any inspections, searches, and seizures of cargo related to its entry into, exit from, or transit within, the United States, that the CBP performs pursuant to its statutory authority to so act. See 19 C.F.R. § 122.2;[16] 19 U.S.C. § 1644(a); 19 U.S.C. § 1581(a), (e). Here, while the cargo was in Defendant's charge, the CBP seized it for further testing to determine whether it was legal industrial hemp or instead illegal marijuana—a status which clearly affects

---

[16] "[A]ircraft arriving or having arrived from or departing for any foreign port or place, and the persons and merchandise, including baggage, carried thereon, shall be subject to the laws and regulations applicable to vessels to the extent that such laws and regulations are administered or enforced by Customs, as provided in 19 U.S.C. 1644 and 1644a." 19 C.F.R. § 122.2.

whether the cargo was being legally exported from the United States to Switzerland.  Thus, the subsequent destruction of the cargo "falls squarely within the 'act of public authority' exception." Best Value, 220 F. Supp. 3d at 302.  Accordingly, under the Montreal Convention, Defendant is not liable for the CBP's destruction of Plaintiffs' cargo.

Nevertheless, Plaintiffs contend the damage did not occur during carriage by air because "[o]nce CBP seized the cargo, it was no longer in Planet Nine's custody. CBP removed it from Charlotte's airport, then destroyed it.  Whenever it was subsequently destroyed, it was not at the airport and not in Planet Nine's custody."  (Doc. No. 72, p. 11).  However, Plaintiffs' own words require the opposite conclusion.  Defendant does not dispute Plaintiffs' summary of the applicable facts, and accepting this sequence as true, it "falls squarely" within circumstances expressly contemplated by the Montreal Convention's elimination of a carrier's liability for the destruction of cargo under the public authority exemption.[17]  See Best Value, 220 F. Supp. 3d at *302 (holding that damage to cargo caused by "the United States agencies responsible for inspecting food imports" "falls squarely within the 'act of public authority' exception.").

Further, Plaintiffs' argument the cargo was destroyed during carriage by land outside of the airport ignores the express language of the Montreal Convention's provisions.[18]  "Importantly,

---

[17] Even after the CBP seized the cargo for further testing, Defendant arguably retained constructive possession or control because the cargo likely would have been released back into Defendant's custody had the results been negative for THC above the legal limit.  See Banihashemrad v. Lufthansa Cargo AG, 28 F. Supp. 2d 1014, 1018 (1998) (holding that under the Warsaw Convention, where a plaintiff had temporary possession of cargo while delivering it to Customs, "the primary party responsible for the possession of the [cargo] was still the 'carrier,'" since the plaintiff could not legally take the cargo until it cleared Customs.)

[18] The cases Plaintiffs cite in this regard are distinguishable.  Here, the cargo was not lost after clearing customs and then damaged at some unknown point before it was delivered months later to its ultimate destination, Danner I, 2010 WL 3294678 at *1, nor was it lost and then damaged at some unknown location between the airport and the final destination, R.R. Salvage Conn., Inc. v. Japan Freight Consolidators (U.S.A.) Inc., 556 F. Supp. 124, 126 (E.D.N.Y. 1983).  Plaintiffs' cargo was not lost at all, and it was not destroyed en route to its final recipient; rather, it was seized at the Charlotte-Douglas International Airport by the CBP, stored by the CBP, tested by the CBP's lab, and then destroyed by the CBP.  These facts do not demonstrate "carriage by land," nor do they make the Montreal Convention inapplicable; rather, they fall completely within its scope.

18

[Article 18's third paragraph] neither restricts carriage by air to the time when the cargo is actually aboard an airplane nor limits it geographically, such as confining it to within an airport." Underwriters at Lloyds Subscribing to Cover Note B0753PC1308275000 v. Expeditors Korea Ltd., 882 F.3d 1033, 1040 (11th Cir. 2018). Here, the seizure—which resulted in the destruction of the cargo—took place at the Charlotte-Douglas International Airport, and the CBP destroyed 2,779.83 pounds of Plaintiffs' cargo only after eight of nine samples tested over the THC content level, pursuant to its statutory authority to do so. 19 C.F.R. § 162.45a; (Doc. No. 72-11, p. 11).[19] The CBP then destroyed the remainder following the resolution of the forfeiture action. Therefore, the Court finds the cargo was destroyed during carriage by air—such that Plaintiffs' claims fall within the Convention's substantive scope—and the public authority exception applies to preclude Defendant's liability.

      3.    Preemption

Therefore, because there is no genuine dispute of material fact that the events that gave rise to all of Plaintiffs' claims occurred during the course of the international carriage of Plaintiffs' cargo, the Montreal Convention applies. Plaintiffs failed to bring their claims pursuant to the Montreal Convention, and because all of Plaintiffs' claims—for negligence, gross negligence, breach of fiduciary duty, negligent misrepresentation, and unfair and deceptive trade practices— seek damages under state law for the destruction of the cargo during carriage by air, they arise

---

[19] In addition to the public authority exception, Defendant argues a second exception applies and precludes Defendant's liability. The Montreal Convention provides that a carrier will not be liable where the destruction of cargo was the result of the "inherent defect, quality or vice of that cargo." Montreal Convention, art. 18 ¶ 2(a). Defendant contends that because the destruction resulted from the cargo's inherent vice—the CBP determined it was illegal marijuana and not legal industrial hemp before destroying it—Defendant cannot be liable. Because the Court finds the public authority exception applies, the Court declines to reach the issue of whether the "inherent vice" exception applies. However, the Court has already determined that Plaintiffs failed to create a genuine dispute of material fact as to the reason the CBP destroyed the cargo. As such, the evidence suggests that the "inherent vice" exception also applies here.

19

from acts that fall squarely within the Montreal Convention's substantive scope and are preempted. See Roberts, 2020 WL 4496544 at *7 (same; collecting cases). Moreover, Plaintiffs emphatically deny that the Convention applies, but even if Plaintiffs had raised their claims pursuant to the Montreal Convention, they are unable to maintain an action under Article 18 for the seizure and destruction of their cargo because the public authority exemption precludes Defendant's liability. Accordingly, Plaintiffs' claims fall within the substantive scope of—and are preempted by—the Montreal Convention, such that Defendant is entitled to summary judgment as a matter of law on all of Plaintiffs' claims.

      4.     <u>Customs Requirements</u>

Finally, the parties dispute who was responsible for completing and filing the requisite customs documents. The parties largely raise this argument with regard to the merits of Plaintiffs' state law claims outside the applicability of the Montreal Convention; however, because the Court has determined the Convention applies, so do its provisions in Chapter II concerning "Documentation and Duties of the Parties Relating to the Carriage of . . . Cargo." Montreal Convention, ch. II. Plaintiffs contend Defendant is liable because it had regulatory and fiduciary duties to file customs paperwork, and its failure to do so resulted in the destruction of the cargo. Conversely, Defendant contends it did not owe Plaintiffs any duty—whether under statute, contract, fiduciary, or otherwise—to file customs paperwork, and further, Plaintiffs cannot establish Defendant's actions were the actual and proximate cause of the cargo's destruction. Accordingly, this Court must determine who bore the responsibility for filing the requisite customs documentation under the Montreal Convention, the applicable statutory and regulatory scheme, and the specific facts of this case.

       *a.*      *The Montreal Convention*

The Montreal Convention addresses which party bears the responsibility for satisfying customs requirements in four relevant provisions. Article 6 — "Document Relating to the Nature of the Cargo," provides:

> The consignor may be required, if necessary to meet the formalities of customs, police and similar public authorities, to deliver a document indicating the nature of the cargo. This provision creates for the carrier no duty, obligation, or liability resulting therefrom.

Montreal Convention, art. 6. This provision neither "imposes any obligation beyond that required by Article 16," nor does it "limit the enforceability of relevant national law," and it "does not create any additional duty, obligation, or liability of the carrier." Montreal Convention, Explanatory Note to art. 6, at *14. As such, it was Plaintiffs' responsibility as the consignor to file any documents related to the nature of their cargo that the CBP requires.

Next, Article 9 — "Non-compliance with Documentary Requirements," states:

> Non-compliance with the provisions of Articles 4 to 8[20] shall not affect the existence or the validity of the contract of carriage, which shall, nonetheless, be subject to the rules of this Convention including those relating to limitation of liability.

Montreal Convention, art. 9. Under Article 9, then, even where the carrier's air waybill or cargo receipt "was not issued in a timely manner or did not meet the requirements of the Convention," any contract for carriage is still valid and the Convention is still applicable. See Vigilant Ins. Co. v. World Courier, Inc., No. 07 CV 194 (CM), 2008 WL 2332343, at *5 (S.D.N.Y. June 4, 2008) (rejecting the argument that because the carrier issued untimely and incorrect air waybills, the Montreal Convention does not apply); AIG Prop. & Cas., Co. v. Fed. Express Corp., No. 15-cv-

---

[20] These provisions discuss the duties related to cargo, contents of airwaybill or cargo receipt, document relating to the nature of the cargo, description of air waybill, and documentation for multiple packages, respectively. Montreal Convention, art. 4–8.

6316 (KBF), 2016 WL 305053, at *6 (S.D.N.Y. Jan. 25, 2016) (same); see also Montreal

Convention, Explanatory Note to art. 9, at *14.  Thus, it does not matter that Defendant failed to

list any cargo on the general declaration; the Montreal Convention still applies to preempt

Plaintiffs' claims.

> Article 10 — "Responsibility for Particulars of Documentation," establishes:
>
> 1. The consignor is responsible for the correctness of the particulars and statements relating to the cargo inserted by it or on its behalf in the air waybill or furnished by it or on its behalf to the carrier for insertion in the cargo receipt or for insertion in the record preserved by the other means referred to in paragraph 2 of Article 4.[21]  The foregoing shall also apply where the person acting on behalf of the consignor is also the agent of the carrier.
> 2. The consignor shall indemnify the carrier against all damage suffered by it, or by any other person to whom the carrier is liable, by reason of the irregularity, incorrectness or incompleteness of the particulars and statements furnished by the consignor or on its behalf.
> 3. Subject to the provisions of paragraphs 1 and 2 of this Article, the carrier shall indemnify the consignor against all damage suffered by it, or by any other person to whom the consignor is liable, by reason of the irregularity, incorrectness or incompleteness of the particulars and statements inserted by the carrier or on its behalf in the cargo receipt or in the record preserved by the other means referred to in paragraph 2 of Article 4.

Montreal Convention, art. 10.  This article expressly "places the burden on the consignor

for ensuring the correctness of the information that it or its agent includes in or provides to the

carrier for inclusion in the air waybill, the cargo receipt, or any other" permissible record.  Id.,

Explanatory Note to art. 10, at *15.  This is so even where the person acting on the consignor's

---

[21] Article 4 requires:

> 1. In respect of the carriage of cargo, an air waybill shall be delivered.
>
> 2. Any other means which preserves a record of the carriage to be performed may be substituted for the delivery of an air waybill.  If such other means are used, the carrier shall, if so requested by the consignor, deliver to the consignor a cargo receipt permitting identification of the consignment and access to the information contained in the record preserved by such other means.

behalf is also the carrier's agent.  Id.  Thus, here, Plaintiffs were responsible for ensuring that either they, or Clark,[22] gave Defendant accurate information to be listed on the air waybill.

Finally, under Article 16 — "Formalities of Customs, Police or Other Public Authorities,"

1. The consignor must furnish such information and such documents as are necessary to meet the formalities of customs, police and any other public authorities before the cargo can be delivered to the consignee.  The consignor is liable to the carrier for any damage occasioned by the absence, insufficiency or irregularity of any such information or documents, unless the damage is due to the fault of the carrier, its servants or agents.
2. The carrier is under no obligation to enquire into the correctness or sufficiency of such information or documents.

Montreal Convention, art. 16.  Thus, it is the consignor's—Plaintiffs'—responsibility to provide the carrier—Defendant—with all documents required by customs before delivering the cargo to the carrier.  See id., Explanatory Note to art. 16, at *16.  Further, this provision establishes the consignor is liable to the carrier for any failure to do so, except where that damage is caused by the carrier or its agents.  Id.  Finally, Article 16 expressly relieves the carrier of any obligation to confirm that customs documents are correct or sufficient under either the Convention or the national customs laws.  Id.  As such, Plaintiffs were required to provide Defendant with any documentation required by the CBP prior to loading their cargo onto Defendant's aircraft, and Plaintiffs alone were responsible for ensuring that those documents were accurate.

The parties do not dispute that Defendant did not receive the customs documentation for the cargo before it was loaded onto its aircraft.  Under the Montreal Convention, Plaintiffs alone bore the responsibility for filing the requisite customs documentation related to the nature of their

---

[22] The parties disagree about Clark's role in this transaction as the intermediary in communications between the two, with both parties asserting he was the agent of the other.  Either way, his role does not affect the conclusion that Article 10 clearly places the obligation for ensuring Defendant, the carrier, had accurate information on Plaintiffs.  As such, the parties' dispute as to Clark's role as an agent fails to create a genuine dispute of material fact, and Plaintiffs' argument that Defendant can be held liable for Clark's actions is without merit because the Montreal Convention expressly precludes this result.

cargo, for ensuring their correctness and sufficiency, and for providing Defendant with those documents before loading their cargo onto Defendant's aircraft. They failed to do so. This conclusion is not altered by Defendant's incorrect general declaration, nor is it affected by Clark's role in the sequence of events; non-compliance with the Convention's provisions does not eliminate its applicability, and even if Clark was acting as Defendant's agent, as Plaintiffs contend, this does not relieve Plaintiffs of the responsibility for ensuring that the proper customs documents were filed correctly. Further, as explained above, the cargo was destroyed because the CBP determined it was illegal marijuana subject to summary forfeiture; this cannot be attributed to Defendant or the incorrect general declaration. Plaintiffs have failed to provide any evidence showing otherwise.

Accordingly, under the Montreal Convention's provisions, Defendant cannot be liable for two reasons: nothing in the Convention places a duty on Defendant to ensure the correctness of requisite customs documents, and Plaintiffs alone were responsible for the contents of the cargo they loaded onto Defendant's aircraft and that was subsequently seized, tested, determined to be illegal, and destroyed. Thus, the cargo's failure to clear customs falls squarely within Plaintiffs' responsibility, and Defendant is relieved of liability resulting from its.

b. *Statutory or Regulatory Duty*

With regard to any applicable national laws, the Montreal Convention recognizes that consignors "may be required, if necessary to meet the formalities of customs, police and similar public authorities, to deliver a document indicating the nature of the cargo." Montreal Convention, art. 6. Further, the Convention provides that the "consignor is liable to the carrier for any damage occasioned by the absence, insufficiency or irregularity of any such information or documents, unless the damage is due to the fault of the carrier, its servants or agents." Id., art. 16.

The United States customs regulations provide additional guidance regarding the documentation required for the international exportation of cargo. In general, three separate documents must be filed in advance: (1) a general declaration; (2) an air cargo manifest, and (3) Electronic Export Information ("**EEI**"). 19 C.F.R. § 122.72. The first two fall within the CBP's authority to regulate air commerce "relate[d] to the entry and clearance of aircraft and the transportation of persons and cargo by aircraft," 19 C.F.R. § 122.0, whereas EEI is part of the Department of Commerce's authority to regulate foreign trade by requiring that exporters file EEI through the Automated Export System ("**AES**") for the purpose of "strengthen[ing] the U.S. government's ability to prevent the export of certain items to unauthorized destinations and/or end users because the AES aids in targeting, identifying, and when necessary confiscating suspicious or illegal shipments prior to exportation." 15 C.F.R. § 30.1(a).

These regulations create two obligations for carriers. First, the "aircraft commander or agent" is responsible for filing both the general declaration and the air cargo manifest with the CBP by completing CBP Form 7507 and 7509, respectively. 19 C.F.R. § 122.73. The general declaration and cargo manifest provide the CBP with information about the aircraft, itinerary, passengers, crew, and any baggage or cargo on board. Id. Further, the cargo manifest must include "all required [EEI] filing citations, exclusions, and/or exemption legends," and must also list "list all cargo laden, and show for each item the air waybill number, or marks and numbers on packages and the types of goods carried. 19 C.F.R. §§ 122.73, 122.75. Second, "at the time of clearance, the aircraft commander or agent must file with the CBP port director of the departure airport any EEI filing citations, exclusions, and/or exemption legends required by the . . . Foreign Trade Regulations." 19 C.F.R. § 122.76.

Conversely, the relevant regulations create one separate obligation for shippers. The United States Principal Party in Interest ("**USPPI**"), or its authorized agent, is responsible for filing EEI through the AES. 15 C.F.R. § 30.2. An EEI filing provides more comprehensive information related to the export transaction, including the identities of the buyer and seller, specific descriptions of the cargo, the selling price, and so on. 15 C.F.R. § 30.6. In an export transaction, the "USPPI is "the person or legal entity in the United States that receives the primary benefit, monetary or otherwise, from the transaction. Generally, that person or entity is the U.S. seller [or] manufacturer." 15 C.F.R. § 30.3(b)(2). The USPPI must file the EEI prior to exportation, 15 C.F.R. § 30.2(b)(1), and for air cargo, the USPPI must "provide the [EEI] filing citation or exemption legend to the exporting carrier no later than two (2) hours prior to the scheduled departure time of the aircraft." 15 C.F.R. § 30.4(b)(ii).

The EEI regulations further establish the specific duties of the parties involved in an export transaction. The party filing the EEI—either the USPPI or its properly authorized agent—is responsible for filing "complete and accurate information . . . in a timely manner," and for providing the carrier with the requisite EEI proof of filing citations and/or exemption legends. 15 C.F.R. § 30.3(d). The carrier, on the other hand, "must not load or move cargo unless the required documentation, from the USPPI or authorized agent, contains the required AES proof of filing, postdeparture, downtime, exclusion or exemption citations," all of which must be cited on any commercial loading documents as well as the outbound manifest. 15 C.F.R. § 30.3(c)(3).

These regulations related to the general declaration, the cargo manifest, and the EEI filing, largely track the obligations that the Montreal Conventions establishes as outlined above. See Montreal Convention, Explanatory Note to art. 6, at *14. Both place the burden on the seller—as the USPPI or consignor respectively—to ensure the accuracy, timeliness, and sufficiency of the

documents related to the nature of the export cargo, and both require that the seller provides that information to the carrier prior to export. Id., art. 6, art. 10 ¶ 1; 15 C.F.R. § 30.3. In addition, both place the burden on the carrier to file customs documentation related to the flight details, itinerary, and contract for carriage. Montreal Convention, art. 4–5; 19 C.F.R. § 122.72. Accordingly, where documents concerning the nature of the cargo are absent, insufficient, or incorrect, the consignor or USPPI is responsible for resulting damage to that cargo, unless they can show that the damage was caused by the carrier. Montreal Convention, art. 16.

Here, Plaintiffs do not dispute that they were the USPPIs; as the sellers wishing to export the cargo to their buyer in Switzerland, Plaintiffs were to receive the primary monetary benefit from the transaction. Thus, pursuant to the regulatory scheme outlined above, Plaintiffs had three obligations: (1) to file the EEI prior to export, (2) to confirm the accuracy of the information therein, and (3) to provide Defendant—the carrier—with the EEI filing citations two hours before the scheduled departure. It is undisputed that no EEI was filed for the flight, and Plaintiffs have failed to provide any support for their argument that this obligation belonged to Defendant, particularly because the regulatory scheme expressly establishes otherwise. Further, without the EEI filing, Defendant could not have, and did not, receive the requisite EEI filing citations to include on the general declaration or outward cargo manifest. Under the plain language of the EEI regulations, these obligations were Plaintiffs' alone, and as such, the failure to file this information rests solely on their shoulders.

In an attempt to circumvent this conclusion, Plaintiffs argue that Defendant undertook these filing duties through the words and conduct of its employees, and through the representations of Clark—who Plaintiffs allege was acting as Defendant's agent. However, this argument fails to relieve Plaintiffs of their EEI obligations. In order for an authorized agent to shoulder the USPPI's

27

filing obligations, the USPPI must expressly authorize that agent to file on its behalf through either a power of attorney or similar written authorization. 15 C.F.R. § 30.3(f). This written agreement "should specify the responsibilities of the parties with particularity and should state that the agent has authority to act on behalf of a principal party in interest as its true and lawful agent for purposes of creating and filing EEI." 15 C.F.R. § 30.3(f).

Plaintiff has not provided any evidence of such an agreement, nor do any of the communications between the parties that are on the record indicate such a grant of authority. (See, e.g., Doc. No. 65-3) (emails between Defendant and Clark discussing the Quote); (Doc. No. 65-8) (same, with Defendant recommending a US customs broker and requesting copies of customs documents from Plaintiffs); (Doc. No. 65-10, p. 5) (same, discussing Switzerland's customs requirements and stating "the paperwork turned out to be much more than they originally thought. . . . The client confirms they are working on all."). Thus, even taking the evidence in the light most favorable to Plaintiffs and assuming either Defendant or Clark undertook to file the EEI on Plaintiffs' behalf, such authority does not satisfy the regulatory requirements and fails to relieve Plaintiffs of the sole responsibility for the accuracy and sufficiency of the EEI filing requirement.

Alternatively, Plaintiffs contend Defendant's inaccurate general declaration caused the destruction of the cargo. Defendant, as the carrier, was responsible for filing the general declaration and cargo manifest with the CBP prior to departing from the Charlotte-Douglas International Airport. Defendant does not—and cannot—dispute Plaintiffs' allegation that the general declaration Defendant filed was inaccurate in that it neglected to list the cargo being transported, (Doc. No. 65-16), and that Defendant failed to file the requisite outward cargo manifest, including the EEI filing citations, (Doc. No. 72-8). However, as outlined above, the applicable regulations provide for separate obligations for both USPPIs and aircraft carriers with

28

their own requirements, purposes, and timelines. Plaintiff attempts to conflate the Federal Trade Regulations concerning EEI with the Air Commerce Regulations related to general declarations and cargo manifests, such that because Defendant undertook to file the general declaration, it also "agreed to handle" all the required CBP filings. (Doc. No. 72, p. 3). Plaintiffs neglect to cite any legal support for this conclusion. However, the regulatory scheme makes clear that while Defendant did violate the general declaration and cargo manifest regulations—for which the CBP cited and fined Defendant, (Doc. No. 72-8)—the separate violation of the EEI regulations cannot be imputed to Defendant. Instead, that violation—and its accompanying penalty—is attributable only to Plaintiffs. (Doc. No. 65-16).

Thus, under either the Montreal Convention or the regulatory scheme, and notwithstanding Defendant's violations, it was Plaintiffs' responsibility alone to file the EEI information, to ensure the correctness and sufficiency of that filing, and to provide the filing citations to Defendant to be included in the outward cargo manifest. Further, only Plaintiffs were responsible for the contents of that cargo, as it was their product they were attempting to export, and they loaded it onto Defendant's aircraft. (Doc. No. 65-18, p. 27). More importantly, as explained above, Plaintiffs have failed to provide any evidence indicating the cargo was destroyed because of any documentation error on Defendant's part. Rather, the evidence establishes the cargo was destroyed only after the CBP seized it, tested it, and confirmed the First Batch was above the legal THC limit and thus subject to summary forfeiture as a Schedule I controlled substance. Accordingly, because Plaintiffs—the seller, consignor, and USPPI—bore the duty to provide the necessary paperwork under both the Montreal Convention and the regulatory scheme, and because the cargo was not destroyed because of Defendant's actions, Defendant cannot be held liable for the destruction of the cargo.

c.       *Fiduciary Duty*

Finally, Plaintiffs argue Defendant's obligations to prepare and file customs documentation on their behalf arose not from the contract but because of a fiduciary duty to do so created by both the applicable regulations and Defendant's undertaking of this responsibility.  However, this argument is without merit.

Plaintiffs allege that Defendant owed a fiduciary duty to comply with 19 C.F.R. §§ 122.72, 122.73, and "especially" 122.76, "because [Defendant] was the only party responsible for doing so – those provisions require only the air commander or airline's agent to submit materials like the EEI, Air Cargo Manifest, and General Declaration." (Doc. No. 72, p. 20).  Not so.  While Plaintiffs are correct that these regulations do place the responsibility on Defendant to file an accurate and sufficient general declaration and cargo manifest, and that the manifest must contain the EEI filing citations, Plaintiffs again conflate these filing obligations with the separate EEI filing requirement. The responsibility for filing the EEI in the first place—which then creates the EEI filing citations to be included on the manifest—is Plaintiffs' alone.  15 C.F.R. §§ 30.2, 30.3

Further, it is true that Defendant "undertook exclusive responsibility to file the General Declaration by preparing and filing it." (Id.).  Contrary to Plaintiffs' argument, however, doing so did not create "at least a 'factual dispute as to whether [it] figuratively held all the cards' creating a *de facto* fiduciary duty." (Id. (quoting Lau v. Constable, No. 16 CVS 4393, 2019 WL 6051554, at *10 (N.C. Super. Ct. Sept. 24, 2019) (cleaned up)).  Rather, Defendant filed the general declaration in compliance with the applicable regulations, and such action is an obligation wholly separate from filling the EEI.  Plaintiff cites no authority for its contention that by agreeing to file one document, carriers also impliedly undertake to perform all necessary customs obligations, and

the regulations expressly provide otherwise.  Accordingly, Defendant did not undertake any further fiduciary duties by filing the general declaration.[23]

## B.    The Remaining Claims[24]

Because no genuine issues of material fact exist as to the applicability of the Montreal Convention and its preemptive effect on all Plaintiffs' claims against Defendant, Defendant's Motion for Summary Judgment, (Doc. No. 64), is **GRANTED** as to all Plaintiffs claims against Defendant.  Accordingly, the only remaining claims in this matter are Defendant's Counterclaims against Plaintiffs, (Doc. No. 22), and Claims against the Third-Party Defendants, (Doc. No. 20). The Court invites Defendant to provide supplemental briefing discussing whether the Court may retain jurisdiction over its Counterclaims and Third-Party Claims under the Montreal Convention.

## IV.    CONCLUSION

Plaintiffs seek damages stemming from the destruction of cargo that occurred during the performance of an international air itinerary, following the CBP's determination that of the

---

[23] In addition, Plaintiffs argue Defendant was responsible for filing all customs documentation because an agency relationship existed between Defendant and Clark, and Clark represented that he would do so.  However, for the reasons discussed herein, under the express terms of the Montreal Convention and regulatory scheme, this argument is without merit because it does not affect the parties' duties and obligations.  As such, the Court declines to reach the issue of whether Clark was Defendant's agent.

However, the Court notes that the evidence appears to indicate no agency relationship existed between Clark and Defendants.  Aside from their own conclusions that Clark had apparent authority to act on Defendant's behalf, Plaintiffs have failed to provide or point to any evidence supporting this conclusion. Colony Assocs. V. Fred L. Clapp & Co., 300 S.E.2d 37, 39 (N.C. Ct. App. 1983) (quoting Vaughn v. Dept. Human Resources, 245 S.E.2d 892, 895 (N.C. Ct. App. 1978));  (See also Doc. No. 65-18, p. 17–20) (Martin's deposition testimony indicating he could not remember how Clark identified himself, whether he claimed to be a charter broker, or whether he said he was Defendant's agent or employee); (Id. at 22 (Martin testifying that he emailed the signed Quote to Clark's email address, "eclark@jetnorthwest.com," which identified "Jet Northwest, LLC" and not Defendant in Clark's signature block); Doc. No. 65-6 (same); 65-7 (same)).  Similarly, Plaintiffs have failed to provide evidence showing Defendant had control over Clark.  Though Defendant paid Clark for his services, (Doc. No. 65-19, p. 10; Doc. No. 65-3, p. 3–4), this alone is insufficient to establish agency; the principal "must also enjoy a right to control the [agent's] activities," and Plaintiffs have not provided any evidence showing that was the case.  General Bldg. Contractors Ass'n, Inc. v. Pennsylvania, 458 U.S. 375, 395 (1982).  Thus, without evidence demonstrating both authority and control, it does not appear that an agency relationship existed.

[24] Because the Court has determined the Montreal Convention preempts Plaintiffs' claims such that Defendant is entitled to summary judgment as a matter of law, the Court declines to reach Defendants additional arguments in support of summary judgment.

31

3,328.05 pounds of alleged industrial hemp Plaintiffs loaded onto Defendant's aircraft, 2,779.83 pounds were instead illegal marijuana. For the reasons discussed herein, the Court finds the Montreal Convention preempts Plaintiffs' state law claims because the claims fall within the Convention's substantive scope. Further, even if Plaintiffs had raised their claims pursuant to the Convention, they would still be unable to recover under its conditions and limits on liability. Accordingly, because there is no genuine issue of material fact, Defendant is entitled to summary judgment as a matter of law on Plaintiffs' claims.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment, (Doc. No. 64), is **GRANTED** as to all Plaintiffs' claims against Defendant.

**IT IS FURTHER ORDERED** that Defendant is **DIRECTED** to provide supplemental briefing as to why this Court may retain jurisdiction over, and why the Montreal Convention does not likewise preempt, Defendant's Counterclaims and Third-Party Claims. **<u>Accordingly, Defendant's briefing shall be due within fourteen days of the entry of this Order, and Plaintiffs and the Third-Party Defendants shall have seven days to file their response.</u>[25]** Thus, the Court **DEFERS** ruling on Defendant's Counterclaims and Third-Party Claims pending receipt of such supplemental briefing or any motions to dismiss pursuant to Rule 41(a)(2) of the Federal Rules of Civil Procedure that Defendant may file.

Pursuant to the Court's April 27, 2023, Order, this matter is scheduled to proceed to trial on any remaining claims during the July 10, 2023, mixed trial term. Accordingly, the parties shall **TAKE NOTICE** that trial is scheduled to begin on **July 10, 2023**. Pretrial Submissions shall be due by **June 19, 2023**. Docket Call will take place at 9:01 a.m. on **July 10, 2023**, and the Final

---

[25] The word limitations established in the Pretrial Order and Case Management Plan apply. (<u>See</u> Doc. No. 47).

Pretrial Conference will take place following Docket Call, in Courtroom #5B of the Charles R.

Jonas Federal Building, located at 401 West Trade Street, Charlotte, North Carolina, 28202.

**IT IS SO ORDERED.**

Signed: June 12, 2023

Frank D. Whitney
United States District Judge